else connected with the prosecution was responsible for this incident.

We find no merit in this bill. In State v. Renaud, 50 La. Ann. 662, 23 So. 894, the father of the deceased was sitting in the audience during the course of the district attorney's argument. The district attorney exclaimed: "What will you do with the accused?" The father said: "Put a rope around his neck." The judge at once took steps to prevent a repetition of such remarks in court. The defendant was found guilty of murder as charged and sentenced to be hanged. This court refused to set aside the verdict, holding that the incident could not be viewed as having unduly influenced the verdict.

In State v. Wimby, 119 La. 139, 43 So. 984, 12 L. R. A. (N. S.) 98, 121 Am. St. Rep. 507, 12 Ann. Cas. 643, the court held that such incidents, not attributable to the prosecution, would not vitiate the verdict. In that case the court cited and reviewed the jurisprudence of this state and cited 12 Cyc. 730, the text reading in part as follows:

"And generally, remarks of by-standers unfavorable to the accused, to or in the presence of members of the jury, and overheard by them, although reprehensible, are not ground for a new trial, unless it shall actually appear that a verdict of conviction was produced thereby."

■ *Bill No. 5.* The trial judge delivered a written charge to the jury. Counsel for defendant excepted to the charge, but according to the per curiam of the trial judge they made no specific objection and failed to state what particular portion of the charge was objectionable.

The judge in his per curiam to this bill says:

"Furthermore, the defense simply reserved a bill. Did not state any objections one way or the other. Did not state any reason at the time as to why the bill was reserved."

Article 391 of the Code of Criminal Procedure provides that every objection to the charge given "shall be accompanied by such a statement of facts as shall show the error in the charge given," and the jurisprudence is uniform to the effect that a general objection to the charge given by the court presents nothing for review; a general objection being too vague and indefinite to be considered. "A bill to the whole charge, without pointing out the errors at the time, as is well established, is worthless." State v. Stickney,

167 La. 1050, 120 So. 853, 855; State v. Scott, 163 La. 25, 111 So. 483; State v. Dreher, 166 La. 924, 118 So. 85 (see ruling on Bill No. 100, p. 984); State v. Capaci (La. Sup.) 154 So. 419.

■ *Bill No. 6* was reserved to the refusal of the court to grant a new trial. This bill sets out that the verdict and sentence were contrary to the law and the evidence. Such bills present nothing for review. The bill further sets up the errors complained of in the various bills of exception from 1 to 5, inclusive. As we have disposed of these bills already, we shall not refer to them again.

The conviction and sentence are affirmed.

## LEAMAN & CLESI, Inc., v. BAUMAN.[*]
### No. 14735.

Court of Appeal of Louisiana. Orleans.
June 28, 1934.

Alex W. Swords, of New Orleans, for appellant.

S. J. Tennant, Jr., of New Orleans, for appellee.

JANVIER, Judge.

This is a suit for a balance alleged to be due on a promissory note. Defendant Bauman admits that he executed the note and that he received cash therefor, but he contends that the note was given merely for bookkeeping purposes and that it was understood that it was not to be paid except out of commissions to be earned by the maker as an employee of plaintiff. In a reconventional demand, Bauman asserts that during the course of his employment by plaintiff corporation, or its precedessor, to which the note was given, he was misled as to the amount of commissions he had earned, and he prays for judgment against plaintiff for a large amount to which he claims to be entitled in addition to the sum which would have been required to retire, in full, the note which forms the basis of the main demand.

Plaintiff corporation is successor to the partnership by which Bauman was, for a time, admittedly employed. The partnership was engaged in the business of dealing in stocks and bonds and other securities. In its business it employed salesmen on a commission basis.

On or about April 2, 1932, defendant made his first contract with the said partnership. He avers that, at that time, he was employed as a salesman and that, as such, he was entitled to a commission of 50 per cent. of the profits on all deals initiated by him.

Plaintiff admits that on July 25, 1932, Bauman entered the employ of the former partnership as a salesman, but asserts that even after that date he was not entitled to 50 per cent. on all deals initiated by him unless those deals were consummated without the collaboration of any other salesman, and plaintiff further and especially asserts that between April 2, 1932, the day on which plaintiff first entered the office of the firm, and July 25, 1932, the day on which his employment as a salesman is admitted to have commenced, his status was not that of salesman or employee of the firm, but was that of private employee of one of the firm's salesmen, a Mr. H. C. Curley. It is contended by plaintiff that Curley personally employed Bauman as a "scout," or, to use another term apparently in common acceptance in the trade, "bird dog."

The duties of Bauman as an employee of Curley's were to run to earth "prospects" who might be interested in trading with or through the firm and particularly through Curley, as salesman. The further contention is made that at no time prior to July 25, 1932, did the firm agree to pay Bauman for his services, and that such amounts as were given him were paid on request of Curley and were charged by the firm against the said Curley; in other words, were paid out of commissions earned by Curley.

It is conceded that the only questions involved are of fact. They are:

1. What was the status of Bauman between April 2, 1932, and July 25, 1932? And

2. On what commission basis was he employed after July 25, 1932?

We find that the parties have agreed as to the amounts and we are, therefore, spared the necessity of delving into the most complicated mass of figures which are found in the record.

In the court, a qua, there was judgment dismissing the main demand and in favor of Bauman on the reconventional demand in the sum of $414.33.

The record is voluminous and contains, on the one hand, testimony of many former employees of Leaman & Clesi who support the charge of Bauman that, in the first period mentioned, he was employed as a salesman by the firm, and who also support his charge that there was an understanding between the firm and all salesmen that the amounts advanced to such salesman, and for which they gave their notes, were to be repaid only out of commissions to be earned, and that it was further understood that if a salesman should leave the employ before he should have earned a sufficient amount to repay the loan, the balance was to be remitted.

As opposed to this evidence we find the testimony of the members of the firm, of the bookkeeper, and of several other employees and former employees to the effect that the understanding was exactly to the contrary and furthermore that Bauman, during that first period, was not employed by the firm.

In view of the fact that the court, a qua, found in Bauman's favor, we would be disposed to accept that finding as correct since, as we have stated, only facts are involved, were it not for several matters on which we believe the evidence to be conclusive to the contrary.

First and foremost, we find that in spite of the testimony of Bauman and of the other

former employees that they understood that their respective notes were not to be paid except out of future earnings, there is in the record a bulletin issued by the firm, initialed by all of the salesmen and initialed by Bauman before he signed the note sued on, which bulletin plainly negatives any such idea. The pertinent portion of it reads as follows:

"All money advanced by the firm, including that which has already been advanced, is given to you only as a loan and is to be considered as advanced on future deals. Every salesman will be required to sign a note for any indebtedness that may be due the firm and same is to be returned when that indebtedness has been paid."

We also note that each of the witnesses who supported Bauman in this contention had a substantial interest in maintaining that contention, since each had been sued by the firm on a similar note, and we also find that one of the witnesses, on whose testimony Bauman particularly relies and who testified that he understood that such notes were not to be paid, had written a letter to the firm upon his resignation, the significant portion of which letter reads as follows:

"The advances given me to secure new business have been greatly appreciated, for which I gave demand notes. This matter has caused me no little concern. I feel that I am in no financial condition to continue this procedure and gamble on any future business which may be secured.

"I will appreciate receiving a statement of my account showing credit for the eight shares of Audubon deal and tentative credits for accrued interest on each deal."

But even had there been no such bulletin, it is almost incredible that the firm would have advanced the very substantial amounts, which were advanced, and have had any such understanding as that contended for by Bauman. Such an understanding would have made it possible for a salesman to whom a large amount had been advanced, and who might develop a few good "prospects," to resign his position and thereby escape liability for the return of the advances, and then to take his "prospects" to some other brokerage house and earn and receive the full commissions.

As to the charge that Bauman was kept in ignorance as to the amount of the profits made by the firm on business initiated by him, so that the firm might give him credit on each deal for a much smaller amount than was actually due to him, we find that at all times Bauman had access to the plaintiff's books and that he could easily have obtained sufficient information to have prevented any such colossal fraud as that which he contends was committed.

Furthermore, all of the trades initiated by Bauman were with his own relatives or with friends who, he knew, relied implicitly on his advice as to the value of the securities in which they were dealing. Yet he would have us believe that he knew nothing whatever as to those values and, therefore, did not know that the amount allowed him in each case was less than he claims it should have been.

In several instances the difference between what he received as a "bird dog" for Curley was many hundreds of dollars less than he would have received had he been actually an employed salesman for the firm. Surely, he could not have been misled to that extent.

We attach little significance to the fact that on the books of the partnership the word "salesman" was entered after the name of Bauman. The bookkeeper testified that the word had been placed there merely for convenience and did not indicate that he, as a matter of fact, had the status of salesman.

Most significant of all we consider the fact that although Bauman claims to have discovered some ten days or two weeks before he resigned in early September that he had been defrauded of several hundreds of dollars, he made no protest, presented no claim, amicably resigned, and said nothing about the fraud until he had been sued on the note more than two months later.

As to the claim that after July 25, 1932, the day on which he was admittedly employed as a salesman, he should have received a commission of 50 per cent. of the profits on each of his "deals," whereas he was given credit for much less, we find the evidence does not bear out his contention that he was to receive 50 per cent.

The record positively shows that nearly all deals in such firms are closed by two salesmen and that the 50 per cent. commission is divided between them or shared between them on an agreed basis. We find from the evidence that that custom prevailed with the firm of Leaman & Clesi and that in each case the agreed amount was credited to Bauman. If Bauman's contention be correct, then the firm should have paid him 50 per cent. of the profits, should have paid some commission to the other salesman, and, manifestly, could not itself have received the 50 per cent. to which, admittedly, it was entitled.

In short, we find that Bauman's defense is a special one and that he has fallen far short of successfully shouldering the burden of proof, which was placed upon him. Nor has he successfully carried the burden of proving the allegations of his reconventional demand.

The judgment on the reconventional demand is annulled, avoided, and reversed, and the said reconventional demand is dismissed.

It is further ordered that the judgment on the main demand be and it is annulled, avoided, and reversed, and there is now judgment in favor of plaintiff, Leaman & Clesi, Inc., and against the defendant, George F. Bauman, in the sum of $139.37 with interest at 8 per cent. thereon from August 22, 1932, and for the additional sum of 10 per cent. on the total of said amounts as attorneys' fees and for all costs.

Reversed.